UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
SVETLANA KLEYMAN, M.D.,

                  Plaintiff,

      - against -

SUNY DOWNSTATE MEDICAL CENTER,
KINGS COUNTY HOSPITAL, and NEW
YORK CITY HEALTH AND HOSPITALS
CORPORATION,

                Defendants.
------------------------------------------------------------x

**<u>MEMORANDUM & ORDER</u>**
18-CV-3137 (PKC) (ST)

PAMELA K. CHEN, United States District Judge:

Before the Court are three competing motions for summary judgment: the motion of

Plaintiff Svetlana Kleyman, M.D., for partial summary judgment against Defendant State

University of New York Downstate Medical Center[1] ("SUNY") on her claims for breach of

contract and failure to accommodate under the Rehabilitation Act of 1973 (the "Rehabilitation

Act"), 29 U.S.C. §§ 701 *et. seq.*, and the New York State Human Rights Law ("NYSHRL"), N.Y.

Exec. Law § 296; Defendant SUNY's motion for summary judgment on all of Plaintiff's claims

against it, including her breach of contract claim and her several claims under the Rehabilitation

Act and NYSHRL; and the joint motion for summary judgment of Defendants Kings County

Hospital ("KCHC") and New York City Health and Hospitals Corporation ("NYCHH") on all of

Plaintiff's claims against each, including her Rehabilitation Act and NYSHRL claims, as well as

her claim under the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-

---

[1] The Court notes that "SUNY Downstate Medical Center is not a legally cognizable entity separate from SUNY, the appropriate institutional defendant." *Harrison v. SUNY Downstate Med. Ctr.*, No. 16-CV-1101 (RRM) (CLP), 2017 WL 4326507, at *1 n.1 (E.D.N.Y. Sept. 25, 2017) (citing N.Y. Educ. Law §§ 351–52).

101 *et seq.*  For the reasons explained below, the Court (1) denies Plaintiff's motion for summary judgment; (2) grants Defendant SUNY's motion for summary judgment as to Plaintiff's claims for breach of contract, disability discrimination, and retaliation, but denies it as to Plaintiff's failure to accommodate claim; and (3) grants in full the summary judgment motion of Defendants KCHC and NYCHH.

## BACKGROUND

### I.    Relevant Facts

#### A.    Plaintiff's Early Residency and Illness

Plaintiff Svetlana Kleyman became a first-year resident in the General Surgery program at SUNY in the fall of 2010.  (Defendant SUNY's Rule 56.1 Statement[2] of Material Facts ("SUNY 56.1"), Dkt. 54, ¶ 1.)  While Plaintiff and Defendant SUNY quibble over the quality of Plaintiff's work in her first few years of residency, it is undisputed that Plaintiff's performance through her PGY-4[3] year was at least adequate.  (*Id.* ¶¶ 7, 8; Declaration of Svetlana Kleyman, M.D. ("Kleyman Decl."), Dkt. 62, ¶ 2.)  Although Plaintiff initially had low scores on the American

---

[2] Unless otherwise noted, a standalone citation to a party's 56.1 statement denotes that this Court has deemed the underlying factual allegation undisputed.  Any citation to a 56.1 statement incorporates by reference the documents cited therein; where relevant, however, the Court may cite directly to an underlying document.  The Court has deemed facts averred in a party's 56.1 statement to which the opposing party cites no admissible evidence in rebuttal as undisputed.  *See Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 12, 2012) ("Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence.  Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything." (emphasis in original)).  Additionally, to the extent a party's 56.1 statement "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts," the Court has disregarded the statement.  *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012).

[3] A first-year resident is known as a "PGY-1," for Post Graduate Year-1.  Subsequent class years are known as PGY-2, PGY-3, etc.  (SUNY's Memorandum of Law in Support of its Motion for Summary Judgment ("SUNY MSJ"), Dkt. 55, at 2 n.2.)

2

Board of Surgery in Training Examination ("ABSITE"), by her PGY-4 year she had raised her scores.  (SUNY 56.1, Dkt. 54, ¶ 8.)

In 2013, while on a break during her PGY-4 year, Plaintiff contracted a serious illness that left her paralyzed, such that she was unable to walk.  (*Id.* ¶ 9.)  She was forced to take time off from her residency to recuperate, but worked to rehabilitate herself so that she could return.  (*Id.* ¶ 10.)

**B.    Plaintiff's Attempted Return to Residency and *Kleyman I***

During her recovery, Plaintiff kept in touch with Dr. Lisa Dresner, the SUNY surgical residency Program Director, and, in 2015, Plaintiff expressed a desire to return to the program in July of that year.  (*Id.* ¶¶ 2, 11–12.)  The parties dispute whether there was a space for Plaintiff to re-enter the program.  SUNY contends that the Residency Review Committee for Surgery ("RRC") of the Accreditation Council for Graduate Medical Education ("ACGME") determines the number of surgical residents allowed for any residency program, and that, in 2015, Defendant SUNY was allotted eight slots each year of PGY-3 through PGY-5, respectively, all of which were already filled.  (*Id.* ¶¶ 13–15.)  Plaintiff disputes this as pretextual, noting, *inter alia*, that members of the program management made comments about not wanting Plaintiff back and that contemporaneous emails from Dr. Dresner stated that she believed returning Plaintiff would not be "a big issue" in terms of clinical capacity (Declaration of Daniel J. Kaiser ("Kaiser Decl.") Exhibit B, Dkt. 65-2, at SUNY001508), but does not proffer alternative evidence about how residency numbers are determined.  Dr. Dresner wrote to Plaintiff on May 21, 2015, informing her that SUNY did not have the clinical capacity to add her as a resident at either the PGY-3 or PGY-4 level.  (Declaration of Clement J. Colucci ("Colucci Decl.") Exhibit 4, Dkt. 48-3, at SUNY001519.)

On April 5, 2016, Plaintiff filed suit against Defendant SUNY in this Court seeking return to her surgical residency program in an action entitled *Kleyman v. SUNY Downstate Medical*

*Center, et al.*, No. 16-CV-2288 (AMD) (E.D.N.Y.) ("*Kleyman I*").  (SUNY 56.1, Dkt. 54, ¶ 20; Plaintiff's 56.1 Statement ("Pl.'s 56.1"), Dkt. 64, ¶ 1.)  The parties resolved that lawsuit in a settlement agreement filed with the Court on December 22, 2016 (the "Settlement Agreement"). Pursuant to the Settlement Agreement, Plaintiff was permitted to return to the residency program as of June 1, 2017.  (*See* Settlement Agreement, Kaiser Decl. Exhibit C, Dkt. 61-3, at 8.)  In connection with its motion for summary judgment in this action, Defendant SUNY claims that it was able to re-admit Plaintiff at that time because it had developed an affiliation with Coney Island Hospital, which had increased its clinical capacity.  (SUNY MSJ, Dkt. 55, at 4 (citing Declaration of Lisa Dresner ("Dresner Decl."), Dkt. 49, ¶ 7)); SUNY 56.1, Dkt. 54, ¶ 19.)  Plaintiff alleges, however, that Dr. Dresner did not investigate whether SUNY's "clinical capacity" changed between the time she wrote to Dr. Kleyman about returning to the residency program in 2015 and settlement negotiations in *Kleyman I*.  (Kaiser Decl. Exhibit I, Deposition of Lisa Dresner ("Dresner Dep."), Dkt. 61-9, at 46:15–65:12, 87:8–98:21; Defendant SUNY's Second 56.1 Counter-Statement, Dkt. 58, ¶ 2.)  Plaintiff re-entered surgical residency at SUNY in January 2017. (SUNY 56.1, Dkt. 54, ¶ 31.)

### C.    *Kleyman I* Settlement Agreement

The Settlement Agreement from *Kleyman I* required Defendant SUNY to provide Plaintiff with a motorized standing wheelchair and a wheelchair-accessible call room.  (*Id.* ¶ 24 (citing Settlement Agreement, Dkt. 61-3, ¶ 13).)  It also required SUNY to assign an occupational therapy student ("OT Assistant") from the College of Health Related Professions to assist Plaintiff in carrying out her residency responsibilities.  (*Id.* ¶ 27 (citing Settlement Agreement, Dkt. 61-3, ¶ 18).)  Under the agreement, "[i]f any disagreement ar[ose] about the scope or nature of the assistance provided by the occupational therapy student, the parties w[ould] engage in a good faith

4

interactive process to resolve the disagreement." (Settlement Agreement, Dkt. 61-3, ¶ 18.) The

"good faith interactive process" was defined as follows:

> If Plaintiff subsequently determines that she requires additional or different
> accommodations for her disability, she shall notify the Office of Diversity and
> Inclusion at SUNY Downstate Medical Center in writing. Once notified in writing
> of Plaintiff's request, SUNY will engage in a good faith interactive process with
> Plaintiff and, if requested, her attorney and provide any appropriate, necessary, and
> reasonable accommodations in accordance with SUNY Downstate Medical
> Center's existing policies and procedures and applicable law.

(*Id.* ¶ 13.)

### D.    Plaintiff's Return to Residency

The standing wheelchair provided for by the Settlement Agreement arrived sometime after

Plaintiff returned to residency and, with it, Plaintiff began to participate in surgeries, primarily

with Drs. Dresner and Alexander Schwartzman. (*Id.* ¶¶ 33–34.) However, at no point after

Plaintiff returned to her residency was she provided an OT Assistant as had been laid out in the

Settlement Agreement. (Pl.'s 56.1, Dkt. 64, ¶ 6.) Over the next few months, Plaintiff emailed Dr.

Dresner at least once noting that she had not yet been provided an OT Assistant (*see* Kleyman

Decl. Exhibit A, Dkt. 62-1, at ECF[4] 2–3), and her counsel raised the issue in his correspondence

with Defendant SUNY's general counsel (Kaiser Decl. Exhibit G, Dkt. 61-7, at ECF 3). (Plaintiff's

56.1 Statement, Dkt. 64, ¶¶ 7–8.) However, the OT Assistant was never provided.

The parties agree that Plaintiff's performance in the operating room upon her return was

adequate. (SUNY 56.1, Dkt. 54, ¶ 34.) Defendant SUNY, however, contends that Plaintiff's

clinical performance during this time was "seriously deficient." (*Id.* ¶ 36.) Specifically, Defendant

SUNY claims that Plaintiff was inconsistent in documenting her cases, failed to do or record her

---

[4] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing
system and not the document's internal pagination.

patient examinations, delegated tasks she should have performed, represented she had completed tasks she had not, communicated insufficiently with patients, lacked professionalism with coworkers, and was disruptive during rounds. (*Id.* ¶¶ 36–37, 42.) Defendant SUNY also found Plaintiff's academic performance deficient, as her ABSITE scores both post-illness and upon return were in the zero percentile. (*Id.* ¶ 40.) Defendant SUNY further contends that on two cases in May 2017, Plaintiff either failed to appropriately diagnose and/or failed to appropriately escalate serious medical issues with patients who then died. (*Id.* ¶¶ 38–39.) These issues were raised with Plaintiff by Drs. Dresner and Schwartzman during her semi-annual review on June 6, 2017. (*Id.* ¶ 43.) Plaintiff disputes the characterization of both her clinical work and her care of the two patients. (*See* Plaintiff's Counter-Statement to SUNY's 56.1 Statement ("Pl.'s SUNY 56.1"), Dkt. 70, at 19–20 ¶¶ 8–13.)

On August 14, 2017, Plaintiff was informed that she was being suspended from the residency program and referred to the Committee for Physician Health ("CPH") to determine whether there was a medical or psychological cause for her performance issues. (Colucci Decl. Exhibit 13, Dkt. 48-12.) The CPH found no medical or psychological reason that Plaintiff could not do the work of the residency, and Plaintiff returned to the residency program on monitored status in December 2017. (SUNY 56.1, Dkt. 54, ¶¶ 45–46.)

Beginning in January 2018, Plaintiff was assigned to the transplant service with Dr. Devon John. (*Id.* ¶ 48.) Plaintiff received negative feedback after her return, and several doctors gave feedback critical of Plaintiff to Dr. Dresner. (*Id.* ¶¶ 50, 54.) On March 13, 2018, Dr. John set forth in a memorandum the substance of a discussion held on March 5, 2018 with Dr. Gruessner and Dr. Dresner and other members of the transplant service about Plaintiff's performance. (*Id.* ¶¶ 58–59.) The memorandum concluded that Plaintiff did "not demonstrate the cognitive and executive

6

skills necessary to become a senior resident and/or chief resident," and that "she m[ight] not be capable of the independent function of a trained physician." (*Id.* ¶ 59.)

### E.    Attempted Rotation at KCHC

SUNY residents sometimes rotate through KCHC as part of their residency training. (KCHC and NYCHH 56.1 Statement ("NYCHH 56.1"), Dkt. 73, ¶ 6.)  When Plaintiff returned to residency after her suspension, she met with Drs. Dresner and Schwartzman, who informed her that she should do a rotation at KHCH.  (*Id.* ¶ 7.)  On February 9, 2018, Plaintiff met with KCHC Equal Employment Opportunity Officer Ms. Shazana Zumpfe Cochran and made her initial request for an accommodation in connection with her anticipated rotation at KCHC.  (*Id.* ¶ 8.) Cochran told Plaintiff, both at the meeting and via email on February 21, 2018, that Plaintiff would need to provide a letter from a healthcare provider detailing the accommodations she needed.  (*Id.* ¶¶ 9–10.)  Plaintiff provided letters from her medical provider on February 26 and March 15, 2018, identifying those accommodations.  (*Id.* ¶¶ 11–12, 19.)

According to Defendants NYCHH and KCHC, progress "stalled" when they learned that there was a question about Plaintiff's PGY level, as her level of residency would impact the reasonableness of her requested accommodations.[5]  (*Id.* ¶¶ 27, 29.)  According to Defendants NYCHH and KCHC, Plaintiff's request for an operating table with an attachment that would enable the table to move presented the biggest issue.  (*Id.* ¶¶ 21, 32.)  On March 28, 2018, Dr.

---

[5] For instance, Defendants NYCHH and KCHC cite to Cochran's example that a PGY-4 resident would need to be near the head of an operating table and directly involved during a surgery, while a PGY-2 resident would be located at the foot of the operating table, and would thus require different accommodations.  (*See* NYCHH 56.1, Dkt. 73, ¶¶ 32–33 (citing Exhibit K to Declaration of Andrew Klaben-Finegold, Dkt. 74-11, ¶¶ 13–14).)  Plaintiff disputes this explanation as pretextual, (*see* Plaintiff's Opposition to NYCHH and KCHC Motion for Summary Judgment ("Pl.'s NYCHH Opp."), Dkt. 67, at 1), but does not point to evidence calling it into question (*see* Plaintiff's Counter-Statement to NYCHH's 56.1 Statement, Dkt. 69, ¶¶ 27–29).

Dresner sent an email to Dr. Muthukumar Muthusamy of KCHC and Dr. Gruessner, stating that Dr. Kleyman would rotate to KCHC on April 15, 2018.  (*Id.* ¶ 34.)  On April 4, 2018, Steven Pulitzer, Chief Medical Officer of KCHC, emailed Dr. Dresner asking her to confirm Plaintiff's PGY level because it still was not clear what kind of work Plaintiff would be doing at KCHC.  (*Id.* ¶¶ 23, 35.)

### F.    Plaintiff's Termination

On March 29, 2018, Drs. Dresner, Schwartzman, Muthusamy, and the senior residents who supervised Plaintiff, met to discuss Plaintiff's performance to date.  (SUNY 56.1, Dkt. 54, ¶ 69.)  Even before this meeting, Dr. Dresner had begun drafting a non-reappointment letter for Plaintiff.  (*Id.* ¶ 70.)  After the meeting, Dr. Gruessner sent a survey to the entire faculty of the SUNY Department of Surgery to see if there was any support for assigning Plaintiff PGY-4 status and responsibilities.  (*Id.* ¶ 71; *see also* Colucci Decl. Exhibit 20, Dkt. 48-19, at ECF 2–33.)  No faculty member who had worked enough with Plaintiff to form an opinion supported her assignment.  (SUNY 56.1, Dkt. 54, ¶ 71.)  Meeting notes taken by Dr. Dresner and the survey circulated by Dr. Gruessner reflect several doctors' criticisms about Plaintiff's abilities (KCHC 56.1, Dkt. 73, ¶¶ 40–47), such as "Dr. Kleyman has poor prioritization skills.  She can only focus on a very limited number of tasks.  She forgets about everything else while working on one task.  Co[n]fused about assigned cases, doesn't act aggressively to participate in cases.  Issues with intubation of a patient" (*id.* ¶ 40).  Another comment stated that Plaintiff was "not honest, incapable to present patients during morning rounds.  Patients' list is not accurate or ready."  (*Id.* ¶ 42.)

After the faculty survey was completed, Dr. Dresner finalized the non-reappointment letter, which she and Dr. Gruessner gave to Plaintiff at an April 9, 2018 meeting, at which they informed Plaintiff of the Department's decision not to reappoint her.  (SUNY 56.1, Dkt. 54, ¶ 72.)  Plaintiff made an audio recording of this meeting, a transcript of which is included as an exhibit to the

Kaiser Declaration.  (Kaiser Decl. Exhibit E, Dkt. 61-5.)  The transcript demonstrates that at the meeting, Dr. Gruessner noted the results of the faculty survey and said, among other things, that Plaintiff should:

> look at [her termination] from the perspective, [if] something really bad were to happen in terms of patient outcome, and even if [Plaintiff] were only remotely involved, the finger-pointing immediately starts.  And one of the faculty said, "look, this is not because we are bad or mean people, all because we only want to protect our patients, but it is also for Svetlana to make sure that she doesn't run into issues that are under different circumstances may not have [] occurred or where she is now, [where she is suddenly] [pulled] to something that is not of her doing."

(*Id.* at 3–4 (fifth and sixth alterations in original).)  Dr. Gruessner further stated to Plaintiff that:

> We also ran into problems, I think we have to be very open about that.  We ran into problems when we talked to our partners at King's County about allowing you to rotate there, because that was after the survey came in, I mean I was still looking for other options.  King's County at this point is not willing to allow rotations on, in their programs, so that's where we are right now.

(*Id.* at 2–3.)

Plaintiff continued on the staff at SUNY's Surgery Department until the end of June 2018 and then left SUNY Downstate.  (SUNY 56.1, Dkt. 54, ¶ 72.)  Plaintiff's termination took effect on June 30, 2018.  (Colucci Decl. Exhibit 21, Dkt. 48-20, at ECF 2.)

## II.    Procedural History

Plaintiff commenced this action on May 29, 2018.  (*See* Dkt. 1.)  Fact discovery was completed by August 1, 2019.  (Dkt. 34.)  On August 22, 2019, Defendants NYCHH and KCHC requested a pre-motion conference in advance of their anticipated motion for summary judgment.  (Dkt. 35.)  Plaintiff replied on September 3, 2019, requesting permission to move for partial summary judgment against Defendant SUNY (Dkt. 36), and Defendant SUNY also requested permission to move for summary judgment on September 4, 2019 (Dkt. 38).  On September 12, 2019, the Court held a pre-motion conference with all parties to discuss their anticipated motions

9

and set a briefing schedule.  (Sept. 12, 2019 Order.)  The motions were fully briefed on February 4, 2020.  (Dkts. 47–77.)

## LEGAL STANDARD

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (noting that summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248. The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party.  *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).  Once this burden is met, however, the burden shifts to the non-moving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial.  *Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A mere "scintilla of evidence" in support of the non-moving party is insufficient; rather, "there must be evidence on which the jury could reasonably find for the [non-movant]."  *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (alteration in original) (quoting *Anderson*, 477 U.S. at 252.  In other words, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (internal quotation and emphasis omitted).

When assessing whether a genuine issue of fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball*

*Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  The Court also construes any disputed facts in the light most favorable to the non-moving party.  *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157–59 (1970).  However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

"When parties cross-move for summary judgment, the Court analyzes the motions separately, 'in each case construing the evidence in the light most favorable to the non-moving party.'" *Frilando v. N.Y.C. Transit Auth.*, No. 18-CV-5204 (LGS), __ F. Supp. 3d __, 2020 WL 1940313, at *4 (S.D.N.Y. 2020) (quoting *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018)).

## DISCUSSION

## I.   Defendant SUNY and Plaintiff's Cross-Motions for Summary Judgment

Defendant SUNY moves for summary judgment on all of Plaintiff's claims, including her claims for failure to accommodate, disability discrimination, and retaliation.  (SUNY MSJ, Dkt. 55, at 2.)  Plaintiff, in turn, moves for partial summary judgment against Defendant SUNY on her failure to accommodate and retaliation claims.  (*See* Plaintiff's Memorandum of Law in Support of her Motion for Summary Judgment ("Pl.'s MSJ"), Dkt. 63, at 1–4, 16–25.)  Because both motions involve discussion of the same issues and evidence, the Court considers them together.

### A.   Failure to Accommodate

Plaintiff claims that Defendant SUNY's undisputed failure to provide her with an OT Assistant entitles her to summary judgment on her failure to accommodate claim.[6]  (*See generally*

---

[6] Though Plaintiff's briefing is not entirely specific about the legal basis for her claim, she appears to bring her claim on both a breach of contract theory, based on Defendant SUNY's failure to fulfill its commitments under the Settlement Agreement, and as a traditional failure to

Pl.'s MSJ, Dkt. 63.)    Defendant SUNY contends that, insofar as Plaintiff brings her accommodation claim under a breach of contract theory, her claim is barred by the Eleventh Amendment because SUNY is a state agency.  (*See* SUNY's Opposition to Plaintiff's Motion for Summary Judgment ("SUNY Opp."), Dkt. 57, at 3–4.)  Defendant SUNY further argues that Plaintiff's failure to accommodate claims under the Rehabilitation Act and NYSHRL fail, as Plaintiff "never invoked the interactive process, and SUNY was unaware of any need for an accommodation," and because the proposed accommodation was unreasonable. (*Id.* at 4–10.) The Court considers these arguments in turn.

### 1.    Breach of Contract Claim

Defendant SUNY contends that Eleventh Amendment state sovereign immunity precludes Plaintiff from bringing a claim for breach of the Settlement Agreement against SUNY because such a claim is a state-law breach of contract claim that cannot be brought in federal court against an unconsenting state entity.[7]  (SUNY MSJ, Dkt. 55, at 22–23.)

Defendant SUNY is correct that a claim for enforcement of a settlement agreement reached in federal court is "essentially [a] state-law contract claim[,]" *StreetEasy, Inc. v. Chertok*, 752 F.3d 298, 305 (2d Cir. 2014), and that "any breach of contract claims against [SUNY] are barred by the Eleventh Amendment" because "SUNY is a state agency entitled to Eleventh Amendment immunity," *Zhao v. State Univ. of N.Y.*, 472 F. Supp. 2d 289, 320–21 (E.D.N.Y. 2007) (citing

---

accommodate claim under the Rehabilitation Act and NYSHRL.  (*See, e.g.*, Pl.'s MSJ, Dkt. 63, at 9.)

[7] Plaintiff cites no case law in response to this argument in either her briefing on her own summary judgment motion or in response to Defendant SUNY's motion.  (*See* Pl.'s MSJ, Dkt. 63; Plaintiff's Reply in Support of her Motion for Summary Judgment ("Pl.'s Rep."), Dkt. 71; Plaintiff's Opposition to Defendant SUNY's Motion for Summary Judgment ("Pl.'s Opp."), Dkt. 68, at 15.)

*Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990)).  However, a federal court may retain ancillary jurisdiction over enforcement of a settlement agreement reached in that court in two circumstances, *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380–82 (1994), namely, when the court "(1) expressly retain[s] jurisdiction over the settlement agreement, or (2) incorporate[s] the terms of the settlement agreement in the order [issuing the settlement agreement]," *Hendrickson v. United States*, 791 F.3d 354, 358 (2d Cir. 2015) (citations omitted).

While Defendant SUNY correctly notes that the text of the Settlement Agreement does not provide that the court in *Kleyman I* would retain jurisdiction over the agreement's enforcement (*see* SUNY MSJ, Dkt. 55, at 22 n.12 (citing Settlement Agreement, Dkt. 61-3)), it does not address the second prong of the *Kokkonen* inquiry.  Defendant SUNY ignores the fact that, in *Kleyman I*, Judge Donnelly signed and so-ordered the Settlement Agreement as part of the Stipulation of Dismissal, *see* Settlement Agreement, General Release, and Order of Dismissal with Prejudice, *Kleyman I* (E.D.N.Y. Dec. 22, 2016) (No. 16-CV-2288 (AMD) (VMS)), ECF. 31, at 21, thereby incorporating the terms of the Settlement Agreement in her order in a way that could give rise to ancillary jurisdiction to enforce the agreement.[8]  *See Frenkel v. N.Y.C. Off-Track Betting Corp.*, 611 F. Supp. 2d 391, 397 (S.D.N.Y. 2009), *opinion adopted*, 701 F. Supp. 2d 544 (S.D.N.Y. 2010) (holding that the court retained jurisdiction where judge so-ordered stipulation and order of settlement incorporating terms of the settlement agreement, even in the absence of an explicit provision reserving jurisdiction); *Thanning v. Nassau Cty. Med. Exam'rs Off.*, 187 F.R.D. 69, 71

---

[8] None of the cases cited by Defendant SUNY involve a situation similar to this one, in which the Court so-ordered the settlement agreement itself, rather than a stipulation of dismissal. In *Kokkonen*, the court presiding over the original contract dispute so-ordered a stipulation of dismissal, rather than the underlying settlement agreement, 511 U.S. at 376–77, and in *StreetEasy*, the court dismissed the case with an order that referred to the settlement agreement but did not include it, 752 F.3d at 305–06.

(E.D.N.Y. 1999) ("[T]he existence of a so ordered settlement agreement incorporates the terms of the settlement into a court order and thereby gives the court jurisdiction to resolve disputes arising out of a breach of the agreement." (citations omitted)); *cf. StreetEasy*, 752 F.3d at 305 n.8 ("Although *Kokkonen* does not state how a district court may incorporate a settlement agreement in a dismissal order, the case does suggest the agreement must be 'embodied' in the dismissal order.  At least one court has suggested that the full text of the settlement agreement should be included in the order of dismissal to constitute incorporation, and another has indicated that physical attachment of a settlement agreement to a dismissal order would not be enough." (internal quotation marks and citations omitted)).  Here, because the Settlement Agreement itself constituted the entire dismissal order, there is no question that Judge Donnelly's order dismissing the case in *Kleyman I* "embodied" the Agreement.

Nevertheless, the Court finds the exercise of ancillary jurisdiction to be inappropriate in this case.  In *Peacock v. Thomas*, the Supreme Court noted that "[i]n determining the reach of the federal courts' ancillary jurisdiction, we have cautioned against the exercise of jurisdiction over proceedings that are entirely new and original" or "where the relief sought is of a different kind or on a different principle than that of the prior decree."  516 U.S. 349, 358 (1996) (internal quotation marks, citations, and alterations omitted).  At least one other court in this district has interpreted this language to imply that a court should not find ancillary jurisdiction where "the [p]laintiff commenced a separate action to enforce a settlement agreement approved by a different judge under a different docket number," even though the agreement in question explicitly provided that that court would retain jurisdiction over its enforcement.  *See Village of West Hampton Dunes v. New York*, 89 F. Supp. 3d 433, 443–45 (E.D.N.Y. 2015).  In *Village of West Hampton Dunes*, Judge Spatt held that "the purpose behind enforcement jurisdiction—namely, 'to enable a court to

14

function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees'—does not support exercising jurisdiction" where a plaintiff opens a new action to enforce a settlement agreement approved in the same district by a different court. *Id.* at 445 (quoting *Epperson v. Ent. Express, Inc.*, 242 F.3d 100, 104–05 (2d Cir. 2001); *see also Winter v. Novartis Pharms. Corp.*, 39 F. Supp. 3d 348, 351–52 (E.D.N.Y. 2014) ("In all of the cases cited by [the] [d]efendant, including *Peacock*, the district court was enforcing a judgment *it itself* had entered. It is clear that the reasoning behind ancillary enforcement jurisdiction is to 'enable a court to function successfully . . . and effectuate *its* decrees,' not the decrees of other federal courts." (emphasis in original) (quoting *Epperson v. Ent. Express, Inc.*, 242 F.3d 100, 104–05 (2d Cir. 2001))). Here, the same considerations apply. When Plaintiff opened this action, she commenced a separate case from *Kleyman I*, seeking distinct relief under a different docket number in front of a different judge, and so deprived this Court of ancillary jurisdiction over enforcement of the Settlement Agreement.[9] The Court therefore grants without prejudice Defendant SUNY's motion for summary judgment as to Plaintiff's claim for breach of the Settlement Agreement.

### 2.   Failure to Accommodate Under the Rehabilitation Act and NYSHRL

Plaintiff also brings her failure to accommodate claim under the Rehabilitation Act and the NYSHRL. Both Plaintiff and Defendant SUNY move for summary judgment on these claims.

---

[9] The Court notes that Plaintiff might well have prevailed upon this breach of contract claim had she brought suit in state court, or, indeed, sought to enforce the Settlement Agreement in the same action, *Kleyman I*. However, neither of those situations is presented here.

In order to make out a *prima facie* case for failure to accommodate under the Rehabilitation Act[10] and NYSHRL,[11] a plaintiff "must establish that (1) she has a disability; (2) the defendant had notice of the disability; (3) she could perform the essential functions of the job with reasonable accommodation; and (4) the defendant refused to make such accommodations." *Kho v. N.Y. & Presbyterian Hosp.*, 344 F. Supp. 3d 705, 721 (S.D.N.Y. 2018) (citing *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006)). "After this *prima facie* case is established, an employer can defeat such a claim if it shows (1) that making a reasonable accommodation would cause it hardship, and (2) that the hardship would be undue." *Quadir v. N.Y. State Dep't of Lab.*, No. 13-CV-3327 (JPO), 2016 WL 3633406, at *2 (S.D.N.Y. June 29, 2016) (internal quotation marks omitted) (citing, *inter alia*, *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)), *aff'd*, 691 F. App'x 674 (2d Cir. 2017). "[F]ailure-to-accommodate claims do not require proof of discriminatory intent." *Brooklyn Ctr. for Psychotherapy, Inc. v. Phila. Indem. Ins. Co.*, 955 F.3d 305, 312 (2d Cir. 2020) (citation omitted).

The briefing in this case does not squarely address whether Plaintiff has shown a *prima facie* case of failure to accommodate. Nevertheless, the Court applies the above standard to what can be gleaned from the submissions. The parties do not dispute that Plaintiff was disabled or that Defendant was aware of her disability. (*See* SUNY MSJ, Dkt. 55, at 17.) Nor do they dispute that, while Defendant SUNY provided Plaintiff with a motorized standing wheelchair and a wheelchair-accessible call room, it failed to provide her with the OT Assistant discussed in the Settlement

---

[10] Defendant SUNY acknowledges that it receives federal funds (*see* SUNY MSJ, Dkt. 55, at 17 n.9), as required to make out a claim under the Rehabilitation Act, *see* 29 U.S.C. § 794(a).

[11] The same standards apply to claims under the NYSHRL (and under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 to 12213 ("ADA")). *See Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 790 (S.D.N.Y. 2020).

Agreement.  (*See* Defendant SUNY's Counter-Statement to Plaintiff's 56.1 Statement, Dkt. 56, ¶ 6; SUNY 56.1, Dkt. 54, ¶ 25.)  The remaining question is then whether Plaintiff has shown that she could perform the essential functions of her job with a reasonable accommodation.

On this point, Defendant SUNY's briefing is inconsistent.  One of its arguments as to why the OT Assistant was an unreasonable accommodation is that Plaintiff was able to perform her essential job functions without the help of an OT Assistant.  (*See* SUNY Opp., Dkt. 57, at 8–9 ("A personal assistant may have made [P]laintiff's general situation more comfortable, but she makes no effort to show that she needed one to do her job.  That is probably because she did not; indeed, [P]laintiff spent her entire post-illness career at SUNY Downstate performing her job functions without regular assistance of this type, and does not contend otherwise.").)  However, SUNY also argues that "[P]laintiff cannot show that she could perform the essential functions of her job with a reasonable accommodation—in fact, she was unable to do so . . ."  (SUNY MSJ, Dkt. 55, at 17.)

"Regarding the third element, a 'reasonable accommodation is one that enables an individual with a disability who is qualified to perform the essential functions of that position . . . to enjoy equal benefits and privileges of employment.'"  *Sivio*, 436 F. Supp. 3d at 790 (alterations omitted) (quoting *Noll v. Int'l Bus. Machs. Corp.*,[12] 787 F.3d 89, 94 (2d Cir. 2015)).  Here, Plaintiff does not assert that she was completely unable to perform the essential functions of her job without the OT Assistant, but rather that performing those functions without the assistant both

---

[12] Though *Noll* addresses a failure to accommodate claim under the ADA, rather than the Rehabilitation Act, the same standards apply.  *See Natofsky v. City of New York*, 921 F.3d 337, 345 (2d Cir. 2019) ("[W]hen a plaintiff alleges an employment discrimination claim under the Rehabilitation Act, the causation standard that applies is the same one that would govern a complaint alleging employment discrimination under the ADA."), *cert. denied*, 206 L. Ed. 2d 822 (Apr. 20, 2020); *Lyons v. Legal Aid Soc.*, 68 F.3d 1512, 1515 (2d Cir. 1995) (stating that the elements needed to demonstrate a failure-to-accommodate claim under either the ADA or the Rehabilitation Act are the same).

"substantially impacted her work performance" and caused her "extreme physical and emotional distress." (Pl.'s MSJ, Dkt. 63, at 19.) Specifically, Plaintiff explains in her Declaration that, without an OT Assistant, she was:

> unable to go to the bathroom (transfer to the toilet seat for both catheterization and bowel program) through entire daily work shifts and 26–28 hour[] calls every 3rd or 4th day, causing nearly unbearable physical and emotional distress. When [she] did manage go to the bathroom in the power standing chair, the catheterization process was unsanitary and much more difficult which led to frequent urinary tract infections. [Plaintiff] was not able to perform a bowel program during [her] calls (26–28 hour shifts). In addition, [she] was unable to without great struggle manage [her] clothing. [She] was also unable to get [her] plastic foot orthotics (AFOs) off during shifts which caused wounds on [her] skin.

(Kleyman Decl., Dkt. 62, ¶ 68.) Dr. Root, Plaintiff's expert, submitted a letter stating that:

> assistance for Dr. Kleyman was necessary in order to create an environment aimed at successful completion of residency training. Missteps in these areas lead to medical complications that can be life threatening. . . . [A]n assistant would have facilitated clothing changes, donning and doffing of orthoses needed to stand in an "operating wheelchair," bladder and bowel routines and position changes including transfers between wheelchair and standing chair. . . . [Plaintiff's] wheelchair transfers, clothing changes, skin care, transfers, timely and sterile bladder catheterization and bowel program routine would have been physically eased by the daily presence of an assistant.

(Letter of Barry C. Root, Dkt. 61-4, at ECF 6.)[13]

The Court finds that this evidence suffices to at least create a dispute of material fact as to whether Plaintiff could perform the essential elements of her job with the reasonable accommodation of an OT Assistant. While Plaintiff was technically able to perform these elements even without the requested accommodation, she has adduced evidence indicating that she did so only by seriously endangering her health.[14] The Court cannot find as a matter of law that Plaintiff

---

[13] While the Court finds that Dr. Root's letter provides some support to Plaintiff's *prima facie* case for failure to accommodate, it notes that the letter is brief and largely conclusory.

[14] The Court acknowledges that "[n]umerous courts in this Circuit have found that plaintiffs do not state a claim for a failure to reasonably accommodate where their own allegations attest that no accommodation was needed in order for them to perform their essential work functions."

was able to enjoy the equal benefits and privileges of employment as a non-disabled person without the aid of an OT Assistant, since those benefits and privileges might include being able to work without avoiding using the restroom for up to 28 hours, or risking or suffering multiple employment-caused urinary tract infections. *Cf. Cadoret v. Sikorsky Aircraft Corp.*, 323 F. Supp. 3d 319, 326 (D. Conn. 2018) ("Despite the fact that Plaintiff concedes he can perform the essential functions of his job, there is a triable issue of fact with respect to whether Plaintiff required an ASL interpreter to access meetings and trainings in the workplace in order to receive equal benefits and privileges of employment."). Finding that Plaintiff has plausibly met her *prima facie* burden with regards to her accommodation claim, the Court next considers Defendant SUNY's other arguments as to this claim.

Defendant SUNY contends first that Plaintiff's accommodation claim fails because "SUNY was unaware of any need for an accommodation" as "[P]laintiff never invoked the interactive process" specified in the Settlement Agreement. (SUNY Opp., Dkt. 57, at 4–7.) "Generally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Costabile v. N.Y.C. Health & Hosps. Corp.*, 951 F.3d 77, 81 (2d Cir. 2020) (citation omitted). However, once an employer is aware that an employee is disabled and has requested an accommodation, "the employer is obligated to engage in an interactive process with their employees and in that way work together to assess whether an employee's

---

*Harvin v. Manhattan & Bronx Surface Transit Operating Auth.*, No. 14-CV-5125 (CBA) (RER), 2018 WL 1603872, at *5 (E.D.N.Y. Mar. 30, 2018) (collecting cases), *aff'd*, 767 F. App'x 123 (2d Cir. 2019) (summary order). However, the cited cases did not involve the same documented risk to the plaintiffs' health as is present here. Moreover, the inquiry into what constitutes a reasonable accommodation asks not simply what "enable[s] an individual with a disability who is qualified to perform the essential functions of that position" but also what enables that individual "to enjoy equal benefits and privileges of employment." *Noll*, 787 F.3d at 94 (quoting 29 C.F.R. § 1630.2(o)(1)(ii), (iii)).

disability can be reasonably accommodated." *Id.* (internal quotation marks and citation omitted); *see also Atencio v. U.S. Postal Serv.*, 198 F. Supp. 3d 340, 357 (S.D.N.Y. 2016) ("Despite the employee's initial responsibility to inform her employer of the need for an accommodation, the regulations impose an obligation upon an employer to take affirmative steps to assist an employee in identifying potential accommodations." (internal quotation marks and citation omitted)).  Here, Defendant SUNY's protestation that "no one, whether responsible for accommodations or not, was otherwise aware of any need [Plaintiff] might have had for the kind of assistance she now says she wanted" (SUNY Opp., Dkt. 57, at 7), is belied by both its explicit promise to provide such assistance, in the form of an OT Assistant, in the Settlement Agreement (*see* Settlement Agreement, Dkt. 61-3, ¶ 18), as well as documented complaints by both Plaintiff and her attorney regarding her lack of an assistant after her return[15] (*see* Kleyman Decl. Exhibit A, Dkt. 62-1, at ECF 3; Kaiser Decl. Exhibit G, Dkt. 61-7, at ECF 2–4).  Moreover, the record shows that SUNY was aware of Plaintiff's request for an OT Assistant because it followed up on that very request with Joyce Sabari, then Chair of the Occupational Therapy Program at SUNY Downstate, who had at least one meeting with Department of Surgery staff, including Dr. Dresner,[16] to discuss

---

[15] The cases cited by Defendant SUNY to support its argument that it was unaware of its obligation to furnish an assistant (that it had already promised to provide) all involve instances in which the plaintiff failed to request an accommodation at any point, and do not have any bearing on its argument that Plaintiff was required to direct her request through the Office of Diversity and Inclusion.  (*See* SUNY Opp., Dkt. 57, at 4–5.)

[16] To the extent Defendant SUNY argues that Dr. Dresner was not an appropriate person to receive this request (*see* SUNY Opp., Dkt. 57, at 6), there is record evidence suggesting that Dr. Dresner was directly involved in procuring the other accommodations for Plaintiff and thus could be viewed, at least by Plaintiff, as the right person to whom to direct her request for the OT Assistant.  (*See* Second Declaration of Daniel Kaiser, Dkt. 65-1, at SUNY001485 ("I am looking for advice in an unusual circumstance: A fourth resident in my general surgery program was struck with a devastating acute illness a year ago and has been on leave for a year. . . .  She is requesting that we purchase a standing wheelchair for her use.  Does anyone on the list have experience or knowledge of anyone having done this?") (email from Dr. Dresner to listserv of doctors); Dresner

Plaintiff's request. (*See* Dresner Decl., Dkt. 49, ¶ 14; Deposition of Joyce Sabari ("Sabari Dep."), Dkt. 48-23, at 16:13–31:20.) While the parties contest the implications of Sabari's testimony, it is undisputed that she was asked about providing Plaintiff with an OT Assistant, and that SUNY subsequently did not provide that assistant. (*See* Sabari Dep., Dkt. 48-23, at 16:13–31:20.) Defendant SUNY therefore cannot argue that it was unaware, no less completely unaware, of Plaintiff's accommodation request. !

Defendant SUNY also contends that Plaintiff failed to properly initiate the "good faith interactive process" laid out in Paragraph 13 of the Settlement Agreement, which required her to "notify the Office of Diversity and Inclusion at SUNY Downstate Medical Center in writing." (SUNY Opp., Dkt. 57, at 5–6 (quoting Settlement Agreement, Dkt. 61-3, ¶ 18).) "Certainly, if an employer has made reasonable efforts to communicate with an employee, or if the employee causes the interactive process to collapse, an employer will not be liable for failing to make an accommodation[.]" *Berger v. N.Y.C. Police Dep't*, 304 F. Supp. 3d 360, 371 (S.D.N.Y. 2018) (internal quotation marks and citation omitted). Here, however, Defendant SUNY does not point to any evidence that it made reasonable efforts to communicate with Plaintiff about accommodation, nor that it was engaged in an interactive process with Plaintiff that she torpedoed. Instead, it relies on language in the Settlement Agreement stating that, "[i]f Plaintiff subsequently determines that she requires additional or different accommodations for her disability, she shall notify the Office of Diversity and Inclusion at SUNY Downstate Medical Center in writing." (*See* SUNY Opp., Dkt. 57, at 5–6 (quoting Settlement Agreement, Dkt. 61-3, ¶ 18).) As a reasonable

---

Decl., Dkt. 49, ¶ 12 ("In addition; the operating room staff had numerous meetings and discussions about what protocols would be necessary for a wheelchair-bound surgeon to operate safely and effectively in the operating room. Over time, both before and after the wheelchair arrived, the staff worked out such procedures successfully.").)

juror could clearly find that Defendant SUNY was aware of Plaintiff's request for an OT Assistant, the Court declines to grant summary judgment for Defendant SUNY on these grounds. [17]

Defendant SUNY further argues that Plaintiff's request for an OT Assistant was "unreasonable" because an assistant is not a reasonable accommodation as a matter of law, and because an occupational therapy student was not well-suited to the tasks for which Plaintiff sought assistance. (*See* SUNY Opp., Dkt. 57, at 7–10.) "The reasonableness of an employer's accommodation is a 'fact-specific' question that often must be resolved by a factfinder." *Noll*, 787 F.3d at 94 (citation omitted). Citing case law from other circuits, Defendant SUNY posits that Plaintiff's OT Assistant request was too broad because it involved a request for a generalized "personal assistant" who "would not assist her with any particular job-related function she could not otherwise perform" rather than an assistant who "directly help[s] someone perform the essential functions of her job, such as providing readers for blind employees." (*See* SUNY Opp., Dkt. 57, at 8.) But, even though Plaintiff did not require the OT Assistant's aid in performing many of her call duties, Plaintiff specifically identified needing help from the assistant in transferring to and from her standing wheelchair, which she used for operating—a primary duty of a surgical resident. (*See* Pl.'s MSJ, Dkt. 63, at 19.) Moreover, "[b]oth the regulations implementing Section 504 and the cases applying the Rehabilitation Act contemplate the

---

[17] Defendant SUNY's invocation of the text of the Settlement Agreement to evade its affirmative burden to engage in an interactive process with Plaintiff is ironic, given its refusal to waive sovereign immunity with respect to Plaintiff's breach of contract claim. However, as Plaintiff notes, it is not even clear that the good-faith process contemplated by the Settlement Agreement applied to the actual provision of an assistant, rather than to disputes over the "scope or nature" of the assistance provided by the putative, non-provided, assistant. (*See* Pl.'s Opp., Dkt. 68, at 2.)

possibility that the use of assistants may be reasonable accommodations." *Borkowski*, 63 F.3d at 142.[18]

Defendant SUNY also argues that Ms. Sabari's testimony that helping someone into and out of a wheelchair is not a traditional occupational therapy function conclusively establishes that providing an OT Assistant was unreasonable. (*See* SUNY Opp., Dkt. 57, at 9 (citing Sabari Dep., Kaiser Decl. Exhibit L, Dkt. 61-12, at 18, 24, 35–36).) But Ms. Sabari also testified that she would have provided an OT student if asked and that she was not consulted about alternative accommodations for Plaintiff. (*See* Pl.'s MSJ, Dkt. 63, at 11–13 (citing Sabari Dep., Dkt. 61-12, at 22, 32, 38–41).) Ms. Sabari's testimony, therefore, is not entirely conclusive. Nor did Defendant SUNY adduce further evidence that might aid in a reasonableness determination, such as information about the "nature and cost of the accommodation," and the "overall financial resources of the employer." *Atencio*, 198 F. Supp. 3d at 357 (internal quotation marks and citation omitted). Thus, the Court cannot find, as a matter of law, that an OT Assistant was an unreasonable accommodation in this case.

Because issues of fact remain as to both Plaintiff and Defendant SUNY's engagement in the interactive process and whether Plaintiff's proposed accommodation was reasonable, summary

---

[18] Defendant SUNY further claims that, although an OT Assistant was an unreasonable accommodation, "had [P]laintiff brought her desires, or her reading of the [S]ettlement [A]greement, to the attention of those empowered to consider accommodations, some practical accommodation could have emerged from the interactive process," such as a system by which various members of the surgery staff learned how to assist Plaintiff in moving from her standing wheelchair to her regular wheelchair. (SUNY Opp., Dkt. 57, at 10.) As discussed above, however, the burden is on the employer to ensure an interactive process. And while, generally, "where an 'employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is plainly reasonable,'" *Berger*, 304 F. Supp. 3d at 369 (quoting *Noll*, 787 F.3d at 94), here, Defendant SUNY acknowledges that it did not offer any such alternatives (*see* SUNY Opp., Dkt. 57, at 10).

judgment must be denied to both Plaintiff and Defendant SUNY on the freestanding failure to accommodate claims under the Rehabilitation Act and NYSHLR.

### B.    Disability Discrimination Related to Plaintiff's Termination

Defendant SUNY also seeks summary judgment on Plaintiff's claims for disability discrimination related to her termination from the residency program.  Though Plaintiff's motion papers, again, are not entirely clear about the legal basis for her claims, the Court construes Plaintiff's briefing as putting forward two different theories as to why her termination was motivated by discrimination: first, that Defendant SUNY's failure to accommodate her contributed to any performance deficiencies it cited as a reason for her discharge (Pl.'s Opp., Dkt. 68, at 9–10); and second, that her performance was nonetheless adequate and that she was terminated because Defendant SUNY did not want a surgeon with a disability in its program (*id.* at 1–2, 11–15).[19]

### 1.    Failure to Accommodate as a Causal Element of Plaintiff's Termination

As to the first theory, failure to accommodate may indeed be an element of an adverse-employment-action-based discrimination claim in addition to forming an independent cause of action.  *See Berger*, 304 F. Supp. 3d at 368; *Ugactz v. United Parcel Serv., Inc.*, No. 10-CV-1247 (MKB), 2013 WL 1232355, at *7 (E.D.N.Y. Mar. 26, 2013) ("The Second Circuit has 'ruled that failure to make reasonable accommodation, when the employee has satisfied the first three[20]

---

[19] Though Plaintiff alleges that Defendant SUNY harbored discriminatory intent toward her when it refused to re-admit her to residency after her illness and throughout her time there (*see, e.g.*, Pl.'s MSJ, Dkt. 63, at 3–5), it seems that the adverse employment action that forms the basis for her claims is her termination, rather than that initial refusal to re-admit her or her suspension after returning to the residency program (*see* Pl.'s Opp., Dkt. 68, at 3, 11–15).

[20] The elements of a *prima facie* case listed in *Parker* and *Ugactz* contain an additional initial requirement, namely, that the defendant is covered by the ADA. Thus, *Parker* and *Ugactz*'s requirement that an employee satisfy the first "three" elements of her claim involves only the first

24

elements of [her prima facie] claim, amounts to discharge because of [her] disability.'" (quoting *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 (2d Cir. 2000))). Where a plaintiff seeks to bring an adverse employment action claim based on a failure to accommodate, that "plaintiff must show the *connections* between (1) the failure to accommodate a disability, (2) the performance deficiencies, and (3) the adverse employment action." *Natofsky*, 921 F.3d at 353 (emphasis in original) (internal quotation marks and citation omitted).[21]

Here, Plaintiff has failed to draw a sufficient causal connection between the failure to provide her with an OT Assistant and the performance deficiencies that Defendant SUNY cited as reason for her termination. The termination letter Plaintiff received from Defendant SUNY lists three main areas of "ongoing deficiencies" in Plaintiff's work: professionalism, clinical skills, and academic performance. (*See* SUNY MSJ, Dkt. 55, at 19–20; Colucci Decl. Exhibit 21, Dkt. 48-20, at ECF 3–4 (letter from Dr. Dresner).) The letter states that Plaintiff, *inter alia*, "abandoned patient care rounds and [her] team in order to argue with a chief resident about the on-call schedule that [she] was dissatisfied with"; that "[w]hen asked about patient information [she] should know but d[id] not remember[,] [she] guess[ed] at the most likely answer, rather than admitting [she] did not know"; that "on several occasions [she] was not able to properly present all of the patients on

---

two elements of the test for a *prima facie* failure to accommodate claim under the Rehabilitation Act and NYSHRL, as articulated *supra*. *See Kho*, 344 F. Supp. 3d at 721 (reciting elements of *prima facie* failure to accommodate claim under the Rehabilitation Act: "(1) [the plaintiff] has a disability; (2) the defendant had notice of the disability; (3) she could perform the essential functions of the job with reasonable accommodation; and (4) the defendant refused to make such accommodations" (citation omitted)).

[21] *Natofsky* frames this requirement as applying generally to failure-to-accommodate claims. However, the failure to accommodate claim in *Natofsky* was based on an adverse employment action—the plaintiff's demotion. *See* 921 F.3d at 352–53. The Court does not read this requirement as applying to freestanding failure-to-accommodate claims not related to an adverse employment action, such as the one discussed *supra*. *See Berger*, 304 F. Supp. 3d at 368.

the service"; that she "could not state the plans of care that were developed when [she] was leading the service"; that "there have been instances where [she] ha[d] not completed the orders on [her] overnight admissions"; that she struggled in her patient presentations with "synthesizing clinical information"; that she failed to act on data, "causing delay in care" and negative outcomes for patients; and that she had performed unsatisfactorily on three surgery exams.  (Colucci Decl. Exhibit 21, Dkt. 48-20, at ECF 3–4.)[22]

Plaintiff, in turn, cites to her own testimony and the letter-report of Dr. Root for the proposition that "her work circumstances were far more difficult because of SUNY's failure to provide to her an assistant."  (Pl.'s Opp., Dkt. 68, at 10.)  Neither of these pieces of evidence, however, connect the failure to provide Plaintiff with an OT Assistant with the specific performance issues cited by Defendant SUNY, and contemporaneously memorialized by Plaintiff's supervisors and trainers, as its reasons for Plaintiff's dismissal.  While Plaintiff's Declaration, as discussed above, demonstrates that Plaintiff was placed in a precarious physical position without an assistant, it does not connect that precarity with the specific performance issues listed by Defendant SUNY, other than to state that the lack of an OT Assistant "contributed to an increase in [Plaintiff's] physical and emotional stress level."  (Kleyman Decl., Dkt. 62, ¶ 67.) Similarly, Dr. Root's letter-report states in perfunctory and general fashion that "the daily availability of an assistant would likely have had a positive impact upon [Plaintiff's] job performance," but does not describe how any of the purported issues with Plaintiff's performance, such as her failure to recall, synthesize, or present patient information, or her failure to properly document her patients' cases, would have been addressed by the provision of an OT Assistant.

---

[22] As discussed in the next section, Plaintiff disputes the validity of a number of these criticisms.

(Letter of Barry C. Root, Dkt. 61-4, at ECF 6–7.)  Even assuming that Plaintiff's theory is that the physical and emotional stress she experienced due to the lack of OT assistance negatively affected her overall work performance, resulting in the specific deficiencies cited by Defendant SUNY, the Court finds that the record is simply insufficient to support that claim.[23]  Because Plaintiff has failed to provide evidence from which a reasonable juror could conclude that her performance issues were a result of Defendant SUNY's failure to provide an OT Assistant, *see Natofsky*, 921 F.3d at 352–53, the Court grants summary judgment to Defendant SUNY on Plaintiff's disability discrimination claims related to her termination from residency insofar as they are based on a failure to accommodate.

### 2.     Whether Plaintiff's Dismissal Was Pretextual

Plaintiff also contends that Defendant SUNY's claims about her performance issues were pretextual and that she was terminated from her residency because Defendant SUNY was biased against her on account of her disability.  (Pl.'s Opp., Dkt. 68, at 1, 11–15.)

---

[23] Plaintiff cites *Borkowski*, for the proposition that "[w]hen an employer fails to provide [a] reasonable accommodation any excuse for an adverse employment action that relies upon an excuse of performance deficiencies presents a question for the jury."  (Pl.'s Opp., Dkt. 68, at 9 (citing 63 F.3d 131)  But Plaintiff leaves out a key part of the reasoning in *Borkowski*, which is that the performance deficiencies must in some way relate to the disability or failure to accommodate.  *See Borkowski*, 63 F.3d at 143 ("Failure to consider the possibility of reasonable accommodation for such disabilities, if it leads to discharge *for performance inadequacies resulting from the disabilities*, amounts to a discharge solely because of the disabilities." (emphasis added)).  In *Borkowski*, the plaintiff "introduced evidence, in the form of letters from a physician and a psychologist, suggesting that the inadequacies in her performance were due entirely to her disabilities," which the Second Circuit found "sufficient to establish, as a *prima facie* matter, that she was denied tenure solely because of her disabilities."  *Id.* (citation omitted).  While Plaintiff might have been able to advance on an accommodation theory of her termination claim in this case had she provided similar evidence, her own and Dr. Root's conclusory and generalized statements that her work circumstances were made more difficult without an OT Assistant are insufficient to draw the necessary connection.  *See id.*

"Claims of discrimination brought under Title VII, the ADEA, ADA, and Rehabilitation Act are analyzed pursuant to the burden-shifting framework described in *McDonnell-Douglas*."[24] *Kho*, 344 F. Supp. 3d at 717 (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)). To survive summary judgment on a claim related to an adverse employment action, a plaintiff must first establish a *prima facie* case of discrimination.  *Id.* at 718.  Once a plaintiff establishes such a case, "'a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors' and the 'burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the disparate treatment.'"  *Id.* (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015)).  If the employer offers such a legitimate reason, "the burden shifts back to the plaintiff to prove that the employer's reason was in fact pretext for discrimination."  *Id.* (quoting *Vega*, 801 F.3d at 83).  "The plaintiff must then put forth adequate evidence to support a rational finding that the reasons proffered by the employer were false, and that more likely than not the employee's protected characteristic was the real reason for the discharge."  *Id.* (alterations omitted) (quoting *Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 249 (S.D.N.Y. 2015)).  "Ultimately, the burden of persuading the trier of fact as to intentional discrimination remains with the plaintiff.  At the summary judgment stage, [s]he must show that the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred."  *Genova v. County of Nassau*, No. 17-CV-4959 (SJF) (AYS), 2019 WL 8407451, at *6 (E.D.N.Y. Dec. 26, 2019) (internal quotation marks and citation omitted), *report and recommendation adopted*, 2020 WL 813160 (E.D.N.Y. Feb. 19, 2020).  "[A] plaintiff alleging an employment discrimination claim under Section 504 of the Rehabilitation Act must

---

[24] The same test also applies to claims of discrimination brought under the NYSHRL.  *See Sivio*, 436 F. Supp. 3d at 796.

show that the plaintiff's disability was a but-for cause of the employer's action." *Natofsky*, 921 F.3d at 341.

Here, the parties do not explicitly address whether Plaintiff has established a *prima facie* case of employment discrimination.[25] Defendant SUNY regards the issue as "irrelevant" because it has fulfilled the second part of the test by advancing a legitimate, nondiscriminatory reason for Plaintiff's termination, thus shifting to Plaintiff the burden of showing that her dismissal was pretextual. (SUNY MSJ, Dkt. 55, at 19–20.) Nevertheless, the Court conducts the full analysis and finds that, construing the facts favorably toward her as the non-moving party, Plaintiff has at least created a triable issue of fact regarding her *prima facie* case of discrimination based on an adverse employment action.

In order to establish a *prima facie* case of discrimination for the purposes of the Rehabilitation Act, a plaintiff must show "(1) that [s]he is an individual with a disability within the meaning of the statute, (2) that [s]he was otherwise qualified for the position or benefit denied, and (3) that [s]he suffered an adverse employment action because of h[er] disability[.]"[26] *De Figueroa v. New York*, 403 F. Supp. 3d 133, 160 (E.D.N.Y. 2019) (internal quotation marks and citation omitted). The first two elements of the *prima facie* test resemble the first two elements of a failure to accommodate claim, as to which the Court has found Plaintiff to have at least created

---

[25] Indeed, inexplicably, Plaintiff's briefing does not address whether she has satisfied the *McDonnell-Douglas* framework for showing disability discrimination at the summary judgment stage. (*See generally* Pl.'s Opp., Dkt. 68; Pl.'s MSJ, Dkt. 63; Pl.'s Rep., Dkt. 71.)

[26] A plaintiff is also required to show that her employer received federal funds, which Defendant SUNY does not dispute. *See supra* n.10.

a triable issue of fact (*supra* Section I.B).[27]  Regarding the third element, there is no dispute that Plaintiff was terminated from her residency program, which constitutes an adverse employment action.  *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) ("[N]or is there any question that termination is an adverse employment action.").  To satisfy the causal portion of this element, "Plaintiff has a *de minimis* burden to produce direct or circumstantial evidence that would lead a reasonable fact-finder to conclude that her discharge occurred under circumstances giving rise to an inference of discrimination."  *Schneider v. Wal-Mart Stores, Inc.*, No. 16-CV-2010 (NSR), 2019 WL 294309, at *4 (S.D.N.Y. Jan. 23, 2019) (internal quotation marks and citation omitted).  "Evidence leading to the inference of discrimination may include discriminatory comments made by the defendant relating to a disability, failure to take actions required for a disabled employee to return to work, or preferential treatment of employees similarly situated to the plaintiff who are not members of the plaintiff's protected class."  *Id.* (footnote and citations omitted).  Plaintiff's briefing lists a set of remarks that she claims are "abundant" evidence of bias against her because of her disability.[28]  (Pl.'s MSJ, Dkt. 63, at 24–25.)  The Court finds that these remarks, in particular Dr. Gruessner's statements at Dr. Kleyman's termination meeting (*see* Kaiser Decl. Exhibit E, Dkt. 61-5), satisfy Plaintiff's *de minimis* burden to show that the circumstances under which she was discharged give rise to an inference of discrimination.  Furthermore, Defendant SUNY's admitted failure to provide Plaintiff with an OT Assistant could

---

[27] "A 'qualified individual' is someone 'who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'"  *Atencio*, 198 F. Supp. 3d at 356 (quoting 42 U.S.C. § 12111(8)).

[28] Because Plaintiff's briefing does not address the proper standard for a discrimination claim, the Court construes Plaintiff's proffer of these remarks as her evidence in support of both a *prima facie* inference of discrimination and of pretext.

be construed as a "failure to take action[] required for [Plaintiff] to return to work[.]" *Schneider*, 2019 WL 294309, at *4.

Because Plaintiff has arguably established a *prima facie* case of disability discrimination, the burden shifts to Defendant SUNY to proffer a "legitimate, nondiscriminatory reason" for Plaintiff's termination. *Kho*, 344 F. Supp. 3d at 718. As discussed above, Defendant SUNY has advanced such a reason, namely, Plaintiff's poor work performance. *See Dixon v. Int'l Fed'n of Accts.*, 416 F. App'x 107, 110 (2d Cir. 2011) (summary order) (citation omitted) (finding employee's "deficient work performance" a "legitimate, non-discriminatory reason" for an adverse employment action)). The deficiencies with Plaintiff's clinical skills and professionalism identified in Plaintiff's termination letter are echoed in numerous places in the record. (*See* Colucci Decl. Exhibits 10–12, 15, and 17, Dkts. 48-8–11, 48-14–16.)

Since Defendant SUNY has met its burden to show a legitimate reason for Plaintiff's termination, the burden shifts again to Plaintiff to show that this reason was merely pretextual. "[O]nce a defendant has established the existence of a non-retaliatory reason for the adverse employment action, a plaintiff must 'establish that the employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action.'" *Bailey v. Mount Vernon City Sch. Dist.*, No. 17-CV-9973 (KMK), 2020 WL 1528481, at *12 (S.D.N.Y. Mar. 30, 2020) (citing *Naumovski v. Norris*, 934 F.3d 200, 215 (2d Cir. 2019)). "Pretext may be demonstrated by additional evidence that the employer's proffered reason is not credible or by reliance on the evidence supporting the *prima facie* case alone." *Schneider*, 2019 WL 294309, at *5 (citing *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994)). Specifically, it may be shown by "demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a

reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Lewis v. Blackman Plumbing Supply L.L.C.*, 51 F. Supp. 3d 289, 304 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).

Drawing all inferences in Plaintiff's favor, the Court construes Plaintiff's pretext argument to be that (1) Defendant SUNY did not want to re-admit Plaintiff to residency after she became disabled and continued to seek a way to get rid of her even after her return; (2) inconsistencies in the record regarding Defendant SUNY's reasons for Plaintiff's termination and contemporaneous metrics of performance imply that Defendant SUNY inaccurately represented Plaintiff's adequate performance as poor in order to build a record justifying her termination; and (3) comments made by various members of the SUNY staff are direct evidence of discrimination. (*See* Pl.'s Opp., Dkt. 68, at 3–5, 11–13.) As discussed below, while Plaintiff has introduced some evidence that might tend to show pretext, she has failed to put forth enough to "establish that the employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action," *Naumovski*, 934 F.3d at 215, or from which a jury could find that disability discrimination was the "but-for" cause of her termination, *see Natofsky*, 921 F.3d at 341.

Plaintiff first argues that Defendant SUNY's stated reason for not returning Plaintiff to her residency after her illness, lack of clinical capacity, was demonstrably pretextual because contemporaneous emails and statements suggest a reluctance to re-admit and accommodate Plaintiff despite an initial statement by Dr. Dresner that she did not think it would be a problem to do so, and because Dr. Dresner did not investigate changes in the program's clinical capacity between its failure to re-admit Plaintiff and settling her lawsuit in *Kleyman I*. (*See* Pl.'s Opp., Dkt. 68, at 3–4.) Defendant SUNY responds with documentation to support its claim that it had limited

capacity to re-admit Plaintiff into its surgical residency program until it affiliated with Cony Island Hospital (*see* SUNY 56.1, Dkt. 54, ¶¶ 13–16, 18–19, 23), which Plaintiff does not meaningfully controvert.  While the emails and comments Plaintiff points to do show a lack of enthusiasm for re-admitting Plaintiff, and certainly demonstrate Defendant SUNY's limited experience in accommodating surgical residents with disabilities, they do not create an issue of fact with respect to her termination following her return to residency, which occurred years later.[29]  *See Horwath v. DHD Windows & Doors, LLC*, No. 18-CV-1422 (CSH), 2020 WL 3316560, at *19 (D. Conn. June 17, 2020) ("There is no bright line rule regarding the length of time that renders an allegedly discriminatory remark too attenuated to constitute evidence of discrimination[, however,] courts in this Circuit have found that a three-month lapse between alleged discriminatory statements and an adverse employment action is too long a gap to find the remark probative of discrimination." (internal quotation marks and citations omitted)).

As to Plaintiff's performance after her restoration to the program, the record spanning from her return in late Spring 2017 to her termination in April 2018 is replete with complaints about Plaintiff's clinical and academic performance and her professionalism, corroborating Defendant SUNY's reasons for Plaintiff's eventual termination.  These complaints take the form of performance evaluations, emails, and memoranda, and contain many of the critiques of Plaintiff's performance listed in her later termination letter, such as failure to properly document her cases (*see, e.g.*, Colucci Decl. Exhibit 10, Dkt. 48-8, at ECF 3; *id.*, Exhibit 11, Dkt. 48-9, at ECF 2–6, 10, 13), lack of professionalism with staff (*id.*, Exhibit 11, Dkt. 48-9, at ECF 24; *id.*, Exhibit 14,

---

[29] The Court does not opine as to whether, had Plaintiff adduced more evidence about measurements of clinical capacity and the process for seeking permission to add additional residents, she might have been able to show pretext relating to Defendant SUNY's failure to re-admit her.  Plaintiff simply did not do so, and there is nothing in the evidentiary record to support this aspect of her claim.

Dkt. 48-13, at ECF 2), and failure to identify/raise serious issues in her patients' cases (*see, e.g.*, *id.*, Exhibit 11, Dkt. 48-9, at ECF 8, 10; *id.*, Exhibit 12, Dkt. 48-11; *id.*, Exhibit 14, Dkt. 48-13, at ECF 3, *id.*, Exhibit 20, Dkt. 48-19, at ECF 18).   These complaints are not isolated and originate from a variety of sources, including Drs. Gruessner, Dresner, Schwartzman, and John (*see, e.g.*, *id.*, Exhibit 11, Dkt. 48-9, at ECF 9, 10, 14–16; *id.*, Exhibit 11, Dkt. 48-10, at ECF 3; *id.*, Exhibit 15, Dkt. 48-14, at ECF 13–15, 25–26; *id.*, Exhibit 15, Dkt. 48-15, at ECF 5; *id.*, Exhibit 16, Dkt. 48-16), as well as, *inter alia*, Drs. Beckles, Gross, Zayko, Ablavsky, and Talus (*id.*, Exhibit 11, Dkt. 48-9, at ECF 2–6, 10, 13, 17, 19; *id.*, Exhibit 15, Dkt. 48-14, at ECF 10–11, 19; *id.*, Exhibit 15, Dkt. 48-15, at ECF 4, 5–9), as well as at least one non-physician member of the hospital staff (*see id.*, Exhibit 11, Dkt. 48-9, at ECF 24).   The August 14, 2017 letter informing Plaintiff of her suspension identifies many of these same issues.   (*id.*, Exhibit 13, Dkt. 48-12.)

Plaintiff's summary judgment briefing disputes the characterization of her performance (*see* Pl.'s Opp., Dkt. 68, at 5, 11–13; Pl.'s SUNY 56.1, Dkt. 70, ¶¶ 7, 36, 42, 44), and, previously, Plaintiff challenged many of her negative reviews at the time they were given (*see, e.g.*, Colucci Decl. Exhibit 15, Dkt. 48-15, at ECF 11–15), and at her deposition (*see* Deposition of Svetlana Kleyman ("Pl.'s Dep."), Dkt. 48-21, at 35–37, 67–68, 110–13, 116–136).   "However, [t]he mere fact that an employee disagrees with her employer's assessments of her work . . . cannot standing on its own show that her employer's asserted reason for termination was pretextual."   *Cappelli v. Jack Resnick & Sons, Inc.*, No. 13-CV-3481 (GHW), 2016 WL 958642, at *8 (S.D.N.Y. Mar. 8, 2016) (alterations in original) (internal quotation marks and citations omitted).   Indeed, "in a discrimination case [the Court is] decidedly not interested in the truth of the allegations against plaintiff," but instead in "what *motivated* the employer; the factual validity of the underlying

imputation against the employee is not at issue."[30]  *Jacobs v. N.Y.C. Dep't of Educ.*, 768 F. App'x 86, 88 (2d Cir. 2019) (summary order) (emphasis in original) (quoting *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006)).

Plaintiff claims that inconsistencies in the feedback she received demonstrate that Defendant SUNY was making a concerted effort to create a negative record of her performance that it would use to support her later termination.  (*See* Pl.'s Opp., Dkt 68, at 11–13.)  In support of this theory, Plaintiff introduces evidence to show that, on occasion, SUNY doctors communicated feedback to her while taking into account the potential legal ramifications of their language.  For example, after one feedback meeting between Dr. John, Dr. Gross, and Plaintiff in January 2017, Dr. John sent his notes on the meeting to Drs. Dresner and Greussner (*see* Second Kaiser Decl. Exhibit C, Dkt. 65-3, at ECF 4–5), and then subsequently forwarded to both an email Plaintiff sent him with her summary of the meeting (*id.* at ECF 3).  Dr. Greussner asked Dr. John if Plaintiff's statement that "[she] was happy to learn that [Dr. John was] satisfied with [her] performance" was true, and noted that, "[i]f not, there needs to be a response [because] of the legal issues."  (*Id.* at ECF 2.)  Dr. Gruessner followed up again to ask Dr. John to respond to Plaintiff, noting that it "[n]eeds to go out to her that she is mistaken in her conclusion and that deficits were clearly identified and discussed.  If we don't respond, her summary has legal implications."  (*Id.*)  Dr. John then responded to Plaintiff's email stating that the transplant team, despite noting

---

[30] Nor do the recommendation letters submitted by Plaintiff contradict the critiques of her performance so as to create a material issue of fact.  Dr. Dresner's letter of support for Plaintiff's residency in another program—which states, *inter alia*, that Plaintiff "was assigned and performed the same duties as other residents" at SUNY, and that she "faced the challenges with strength and determination," and "has shown grit, courage and perseverance"—is perfunctory and does not speak to Plaintiff's clinical skills or her professionalism or academic abilities.  (*See* Second Kaiser Decl. Exhibit D, Dkt. 65-4.)  The other letters are from non-surgical sources.  (*See* Second Kaiser Decl. Exhibit E, Dkt. 65-5.)

improvements, was "not satisfied" with Plaintiff's performance.  (Colucci Decl. Exhibit 15, Dkt. 48-14, at ECF 23.)  Plaintiff contends that both Dr. John's initial notes on the meeting (Second Kaiser Decl. Exhibit C, Dkt. 65-3, at ECF 4–5), and the transcript she submits of a recording she took during the meeting (Second Kleyman Decl. Exhibit B, Dkt. 66-2), reflect feedback "not consistent" with the subsequent negative summary she received (*see* Pl.'s Opp., Dkt. 68, at 11–12).

Despite Plaintiff's representations, however, the Court finds that the purported gap or inconsistency between the contemporaneous accounts of her performance review and the subsequent feedback she received is insufficient to support a finding of pretext.  While Dr. John's notes and language during the review did reflect agreement with Plaintiff that her performance was improving, and did not specifically state that her performance was insufficient, the majority of both the notes and transcript address Plaintiff's ongoing performance issues.  And though Plaintiff complains that the feedback she received was not sufficiently severe to put her on notice that she was at risk of termination (*see* Pl.'s Opp., Dkt. 68, at 11), the Court notes that her performance reviews were instituted upon her post-suspension re-instatement, and that her re-instatement letter clearly stated that "failure to remediate [her] deficiencies will result in [her] termination from the program"[31] (*see* Colucci Decl. Exhibit 14, Dkt. 48-13, at ECF 2).

The Court does find that Dr. Gruessner's remarks at Plaintiff's termination meeting, that Plaintiff might be blamed for something that went wrong with a patient, even if she was minimally

---

[31] While the consideration paid by Drs. John, Dresner, and Greussner to the legal implications of Plaintiff's reviews might suggest pretext, the Court notes that they occurred after Plaintiff's initial lawsuit and within the context of Plaintiff's post-suspension monitored status, and that Plaintiff, herself, seems to have anticipated the legal implications by recording the feedback meeting.  More relevantly, as discussed above, the substance of the feedback did not shift significantly even when its legal implications were considered.

involved, *could* constitute evidence of anti-disability bias or hostility.  *See Horwath*, 2020 WL 3316560, at *19 (finding that statements by a supervisor "point[ed] toward a discriminatory animus" in the "context" of a "decision-making process" (quoting *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010)); *Lewis*, 51 F. Supp. 3d at 303–04 (finding a supervisor's statements supportive of pretext where they were "inconsistent" with the "proffered legitimate reasons" for plaintiff's termination (citation omitted)).   Nonetheless, Plaintiff simply has not brought forth sufficient evidence to enable a reasonable jury to determine that the performance-related reasons given for her termination were "false or inadequate to support" her termination, even when taking into account Dr. Gruessner's remarks.  *Naumovski*, 934 F.3d at 215.[32]  The negative evaluations of Plaintiff's performance, and the ultimately negative responses to the survey asking whether she should be promoted, came from a variety of sources and were steady and consistent, and Plaintiff has pointed to no evidence to show that these responses were solicited or orchestrated to build a record justifying her termination.[33]

Nor has Plaintiff introduced other types of evidence that might tend to support a claim of discrimination, such as evidence of disparate treatment or a departure from Defendant SUNY's regular practices.  Plaintiff nods toward a disparate treatment argument, claiming that she was

---

[32] Nor does the Court find compelling Plaintiff's claim that pretext is shown because Dr. Dresner began a draft of Plaintiff's termination letter before receiving the results of the faculty survey.  (*See* Pl.'s Opp., Dkt. 68, at 13.)  As discussed above, it was clear that termination was a possible outcome at that point.

[33] Indeed, it appears that Plaintiff did not depose many of the doctors who gave her negative reviews or who responded that she should not be promoted.  While evidence supplied by Defendant SUNY demonstrates how reputation may influence perceptions of competence within an institution (*see, e.g.*, Colucci Decl. Exhibit 20, Dkt. 48-19, at ECF 26 (showing that, in response to the survey about whether Plaintiff should be promoted to PGY-4, one staff member replied, "[i]nsufficient personal contact to evaluate.  Anecdotes would indicate: No")), Plaintiff has not demonstrated that the negative feedback she received was based on reputation or in some way encouraged by Defendant SUNY or by Drs. Greussner and Dresner as decision-makers.

treated more negatively than the other doctors who were also defendants in the malpractice lawsuit related to one of the incidents that Defendant SUNY cites as evidence of her faulty performance (*see* Pl.'s Opp., Dkt. 68, at 5 (citing Second Kleyman Decl., Dkt. 66, ¶ 5)), and that other residents with poor ABSITE scores were not terminated from the program (Second Kleyman Decl., Dkt. 66, ¶¶ 10–21). Plaintiff also claims, without elaboration, that termination from a residency is a "very rare consequence for a surgical resident." (Pl.'s Opp., Dkt. 68, at 11.) "To be similarly situated, [however,] other employees must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it." *Clark*, 96 F. Supp. 3d at 256 (alterations omitted) (internal quotation marks and citation omitted). Because Plaintiff has not provided sufficient information about either her co-defendants in the malpractice suits, the other doctors with low ABSITE scores, or any other terminated residents, she cannot show pretext based on disparate treatment. *See Rivera v. Orange County*, No. 10–CV–9134 (VB), 2013 WL 812016, at *7 (S.D.N.Y. Mar. 5, 2013) (holding that the plaintiff failed to show that the defendants' reasons for firing him were pretextual because, "[t]o the extent [the] plaintiff cite[d] [other] employees as comparators, he fail[ed] to show how he and they were similarly situated in all material respects" (internal quotation marks omitted)). Nor has Plaintiff put forth any evidence to suggest that Defendant SUNY acted inconsistently with its own standards, policies, or procedures in terminating her, which might also have helped to establish pretext. *See Corona v. Clarins U.S.A., Inc.*, No. 17-CV-4438 (JGK), 2019 WL 4393082, at *8 (S.D.N.Y. Sept. 12, 2019) ("[A] company [that] ignores its own policies or procedures when it takes action against an employee can cast doubt on the good faith of the process." (citing *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997))).

The burden facing plaintiffs who attempt to prove a disability discrimination claim based on an adverse employment action is high.  Unlike Title VII claims, which can survive summary judgment if a plaintiff shows that bias was a "motivating factor," *see Holcomb v. Iona College*, 521 F.3d 130, 142 (2d Cir. 2008), the Rehabilitation Act requires that a plaintiff demonstrate but-for causation, *Natofsky,* 921 F.3d at 341.  While it is possible that Plaintiff here might have been able to proceed under a mixed-motive standard (or, indeed, under the current standard, had she gathered additional evidence), based on the current record, she has not introduced sufficient evidence for a reasonable jury to find that she would not have been terminated but-for her disability.  As such, her claims for disability discrimination under the Rehabilitation Act and NYSHRL must be dismissed.  The Court, therefore, grants Defendant SUNY summary judgment as to these claims.

### C.      Plaintiff's Retaliation Claim

Both Plaintiff and Defendant SUNY also cross-move for summary judgment on Plaintiff's retaliation claim against Defendant SUNY for its failure to provide her with an OT Assistant.  To make a *prima facie* claim for retaliation under the Rehabilitation Act, a plaintiff must show that "(i) [she] was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Natofsky*, 921 F.3d at 353.[34]  As Defendant SUNY notes (*see* SUNY MSJ, Dkt. 55, at 21), "[g]enerally, a failure to provide an accommodation is not in and of itself an adverse employment

---

[34] The same standards for showing retaliation apply to both the Rehabilitation Act and NYSHRL.  *See Sivio*, 436 F. Supp. 3d at 798–99.  The Court notes, however, that Plaintiff's briefing does not discuss the standard for showing retaliation under either statute.  (*See* Pl.'s MSJ, Dkt. 63; Pl.'s Rep., Dkt. 71; Pl.'s Opp., Dkt. 68.)

action" to support a retaliation claim.[35] *Kelly v. N.Y. State Off. of Mental Health*, 200 F. Supp. 3d

378, 406 (E.D.N.Y. 2016) (internal quotation marks, alteration, and citations omitted); *see also*

*Sosa v. N.Y.C. Dep't of Educ.*, 368 F. Supp. 3d 489, 496 (E.D.N.Y. 2019) ("While courts may

consider the underlying conduct of an alleged failure to accommodate, a failure to accommodate,

by itself, is not sufficient for purposes of establishing an adverse employment action." (internal

quotation marks and citation omitted)).

Here, while Plaintiff's lawsuit for re-admission against SUNY could qualify as a protected

activity, Plaintiff has not introduced any evidence to show that the conduct underlying Defendant

SUNY's failure to provide her with an OT Assistant was retaliatory in any way, so as to exempt

that failure from the general rule that failure to accommodate does not, by itself, constitute an

adverse employment action.  Instead, she merely asserts, without legal citation, that summary

judgment should be granted on her retaliation claim because of Defendant SUNY's "failure to

offer a legitimate non-retaliatory explanation for the failure to honor the settlement agreement's

terms."  (Pl.'s MSJ, Dkt. 63, at 3.)  This is plainly insufficient to satisfy the third and fourth

---

[35] Though Plaintiff's Amended Complaint uses versions of the term "retaliation" to describe (1) Defendant SUNY's failure to reinstate Plaintiff (*see* Amended Complaint, Dkt. 23, ¶ 5); (2) the conditions faced by Plaintiff after her return to residency, including specifically a supervising doctor's assignment of residents junior to Plaintiff to more advanced operations (*id.* at 3, ¶ 30); and (3) the cognitive exam to which Plaintiff was required to submit (*id.* at 3, ¶ 37), as well as to describe her treatment generally in response to her objections to discrimination, her briefing at the summary judgment stage links her retaliation claim solely to Defendant SUNY's failure to accommodate her by providing an OT Assistant after promising to do so (*see* Pl.'s MSJ, Dkt. 63, at 23–24; Pl.'s Opp., Dkt. 68, at 6).  Because Plaintiff does not brief retaliation as to other contexts or adverse employment actions, either in her own papers or in response to Defendant SUNY's motion, and because Plaintiff has not identified any material evidence to show that other adverse actions were taken in response to her own protected actions, the Court does not consider whether Plaintiff could have based a retaliation claim on any other circumstances originally alleged in this case.  *See Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 208 (S.D.N.Y. 2009) (finding that, where plaintiff "made no attempt to rebut defendants' motion for summary judgment" on his retaliation claim under the Family and Medical Leave Act, he had abandoned the claim); *id.* at 208 n.108 (collecting cases).

elements of a *prima facie* claim of retaliation.  *See Kelly*, 200 F. Supp. 3d at 406.  Because Plaintiff

has not made out even a *prima facie* case of retaliation, Plaintiff's motion for summary judgment

is denied, and Defendant SUNY's motion is granted with respect to Plaintiff's retaliation claims

under the Rehabilitation Act and the NYSHRL.

## II.    Defendants KCHC and NYCHH's Motion for Summary Judgment

Plaintiff also brings claims against Defendants KCHC and NYCHH for disability

discrimination under the Rehabilitation Act, NYSHRL, and NYCHRL. (Amended Complaint,

Dkt. 23, ¶¶ 74–78, 82–83.)  These Defendants move for summary judgment, contending that (1)

Plaintiff's claim for failure to accommodate should be dismissed because NYCHH acted

reasonably in responding to her accommodation requests, and Plaintiff was terminated while

NYCHH was still in the process of accommodating her; (2) Plaintiff's disability discrimination

claims should be dismissed because NYCHH was not Plaintiff's employer and did not make the

decision to terminate Plaintiff; and (3) Plaintiff's claims against KCHC should be dismissed as it

is not a suable entity.   (NYCHH and KCHC Memorandum of Law in Support of Motion for

Summary Judgment ("NYCHH MSJ"), Dkt. 75, at 3–15.)  For the following reasons, the Court

grants Defendants NYCHH and KCHC's motion in full and dismisses the claims against them.[36]

### A.    Failure to Accommodate

Defendant NYCHH contends that Plaintiff cannot make out a *prima facie* case for failure

to accommodate under the Rehabilitation Act because the evidence shows that NYCHH neither

---

[36] Defendant KCHC is dismissed from this suit because, as it argues, it is not a suable entity.  *See Sulaymu-Bey v. City of New York*, No. 17-CV-3563 (AMD) (SJB), 2019 WL 1434597, at *10 n.18 (E.D.N.Y. Mar. 29, 2019) (dismissing KCHC).  Under the New York City Charter, actions must be brought in the name of the City of New York unless "otherwise provided by law."  N.Y. City Charter Ch. 17, § 396.  "Kings County Hospital is operated by the Health and Hospitals Corporation of the City of New York" and, "[a]lthough Health and Hospitals Corporation has the capacity to be sued by statute, Kings County Hospital does not."  *Sulaymu-Bey*, 2019 WL 1434597, at *10 n.18 (internal quotation marks and citations omitted).

refused to accommodate Plaintiff nor failed to engage in an interactive process.  (NYCHH MSJ, Dkt. 75, at 3–7.)  The Court agrees.  The undisputed record demonstrates that Defendant NYCHH engaged in an interactive process with Plaintiff regarding the accommodations Plaintiff sought at KCHC.  Beginning in February 2018, Plaintiff provided NYCHH with accommodation requests, and, over the next month and a half, met and communicated multiple times with KCHC's EEO Officer, Cochran, who began to work on implementing Plaintiff's accommodations.  (NYCHH 56.1, Dkt. 73, ¶¶ 8–26.)  Defendant NYCHH reports that progress "stalled" when a question about Plaintiff's PGY level arose.  (*Id.* ¶ 27.)  On March 28, 2018, Dr. Dresner (SUNY) sent an email to Dr. Muthusamy (KCHC) and Dr. Gruessner (SUNY), stating that Plaintiff would rotate to KCHC on April 15 of that year.  (*Id.* ¶ 34.)  On April 4, 2018, Dr. Pulitzer (KCHC) emailed Dr. Dresner asking her to confirm what Plaintiff's PGY level was, since it was still unclear what kind of work she would be doing during the rotation.  (*Id.* ¶ 35.)  Plaintiff's residency was then terminated by SUNY on April 9, 2018.  (*Id.* ¶ 36.)  There is thus no evidence that Defendant NYCHH ever refused to accommodate Plaintiff, so as to satisfy the fourth prong of a *prima facie* case for failure to accommodate.  *See Kho*, 344 F. Supp. 3d at 721.  Nor did Defendant NYCHH's delay in arranging the accommodations take so long as to constitute a refusal by deferral.  *See Clark*, 96 F. Supp 3d at 260 (rejecting claim that five-week delay in accommodating was a constructive denial, and noting that "courts in the Second Circuit have consistently held that a plaintiff is required to provide evidence that the delay was motivated by the employer's discriminatory intent, as opposed to mere negligence" (citation omitted)).  Because Plaintiff cannot make out a *prima facie* case, her Rehabilitation Act failure to accommodate claim as to Defendant NYCHH fails.[37]  !

---

[37] Additionally, because Plaintiff does not respond to Defendant NYCHH's argument regarding her failure to accommodate claim (*see* Plaintiff's Opposition to NYCHH and KCHC

### B.     Disability Discrimination

Plaintiff's Rehabilitation Act disability discrimination claim as to Defendant NYCHH also do not survive summary judgment.  The same test for disability discrimination discussed above with respect to Defendant SUNY applies to Plaintiff's claims against NYCHH.[38]  Assuming, *arguendo*, that Plaintiff has established a *prima facie* case of disability discrimination against NYCHH based on its failure to permit, or delay in permitting, her to rotate,[39] *see Greenberg v. N.Y.C. Transit Auth.*, 336 F. Supp. 2d 225, 247 (E.D.N.Y.2004) ("Certainly, a delay in reinstating an employee constitutes an adverse employment action[.]" (citation omitted)), Plaintiff has not shown that Defendant NYCHH's failure to arrange rotations for her was pretextual.  Rather, the evidence supports Defendant NYCHH's stated non-discriminatory reason for not starting Plaintiff's rotation at KCHC, namely, that it was still in the process of determining Plaintiff's residency year, both to determine her duties and the accommodations she would therefore require when she was terminated by Defendant SUNY.

Plaintiff's sole evidence of pretext are two purported statements from Dr. Muthusamy at KCHC: (1) a comment attributed to Dr. Muthusamy by Dr. Dresner at a meeting on March 28,

---

Motion for Summary Judgment ("Pl.'s NYCHH Opp."), Dkt. 67), the Court deems her to have abandoned it.  *See Di Giovanna*, 651 F. Supp. 2d at 208.

[38] Plaintiff again does not specifically address the *McDonnell-Douglas* burden-shifting framework in her briefing.  (*See generally* Pl.'s NYCHH Opp., Dkt. 67.)  Arguably, however, the adverse employment action around which she builds her claim is not NYCHH's failure to let her rotate, but her termination, which she claims was due in part to her inability to rotate at KCHC.  (*See id.* at 1 (referring to Dr. Gruessner's statement in Kaiser Decl. Exhibit E, Dkt. 61-5, at 2–3).)  Because the Court's ruling on this claim is not based on the absence of an adverse employment action, however, it is immaterial which adverse employment action forms the basis of Plaintiff's claim.

[39] However, to the extent the delay was based on NYCHH's failure to accommodate Plaintiff, the failure to accommodate does not in and of itself constitute an adverse employment action, as noted *supra*.

2018 that Plaintiff "lacks the insight"[40]; and (2) a comment attributed to Dr. Muthusamy[41] by Dr. Dresner from 2016 or 2017 in which Dr. Muthusamy expressed concerns about Plaintiff's ability to take call shifts and be available during emergency surgeries because she was in a wheelchair.[42] (*See* Pl.'s NYCHH Opp., Dkt. 67, at 7–8 (citing Kaiser Decl. Exhibit H, Dkt. 61-8, at ECF 2; Dresner Dep., Dkt. 61-9, at 84).)  These two comments are plainly insufficient to meet Plaintiff's burden to show pretext.  As Defendant NYCHH asserts (*see* NYCHH Reply in Support of Motion for Summary Judgment, Dkt. 76, at 1–2), the first comment is facially neutral and in no way reflects disability discrimination, and the second was remote in time, i.e., over a year before Plaintiff was to rotate to KCHC, and apparently a stray remark.  *See Galimore v. City Univ. of N.Y. Bronx Cmty. Coll.*, 641 F. Supp. 2d 269, 284 (S.D.N.Y. 2009) ("[T]he Second Circuit has found that the term 'stray remark' 'represented an attempt—perhaps by oversimplified generalization—to explain that the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination.'" (quoting *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007))); *Johnson v. County of Nassau*, 480 F.

---

[40] Plaintiff misquotes and mischaracterizes this statement in her briefing by representing it as a statement that Plaintiff "lacked insight into her medical condition."  (*See* Pl.'s NYCHH Opp., Dkt. 67, at 7.)

[41] Though the parties dispute Dr. Muthusamy's role in the accommodation process, it is undisputed that, with regard to Plaintiff's termination, Dr. Muthusamy "participate[d] in the decision making process but [wa]s not the final word on what happens to a resident."  (Plaintiff's Counter-Statement to NYCHH's 56.1 Statement, Dkt. 69, 13–14 ¶ 63, 14 ¶ 3.)

[42] Plaintiff also attempts to argue that Defendant NYCHH's reason for its delay in accommodating her was pretextual because it did not solve its question about Plaintiff's PGY status by asking Plaintiff.  (*See* Pl.'s NYCHH Opp., Dkt. 67, at 1.)  However, the uncontroverted evidence is that Defendant NYCHH's practice was to receive that information from Defendant SUNY or a resident's medical supervisor (*see* Second Kaiser Decl. Exhibit G, Dkt. 65-7, at 56–57), and, therefore, Plaintiff's assertions that she could have answered the question do not create an issue of material fact as to pretext.

44

Supp. 2d 581, 599 (E.D.N.Y. 2007) ("The Second Circuit has repeatedly held that 'stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination.'" (quoting *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001))).  Because Plaintiff cannot demonstrate that the failure to permit or arrange her rotation at KCHC was motivated by discrimination, the Court grants Defendant NYCHH summary judgment as to Plaintiff's Rehabilitation Act claim for disability discrimination and dismisses that claim.[43]

Additionally, because the Court dismisses Plaintiff's Rehabilitation Act claims against Defendant NYCHH, it declines to exercise supplemental jurisdiction over her NYSHRL and NYCHRL claims against Defendant NYCHH and dismisses those claims without prejudice.  *See Clemens v. Moody's Analytics, Inc.*, 770 F. App'x 10, 12 (2d Cir. 2019) (summary order) ("If the District Court decides, after giving the parties notice and an opportunity to be heard, to decline supplemental jurisdiction over [the remaining state law] claims, it should dismiss them without prejudice[.]" (internal citation omitted)).

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment is denied. Defendant SUNY's motion is granted as to Plaintiff's breach of contract claim and her disability discrimination and retaliation claims under the Rehabilitation Act and NYSHRL, but is denied as to Plaintiff's failure to accommodate claim under the Rehabilitation Act and NYSHRL.  Those claims shall proceed to trial.  Defendants Kings County Hospital and New York City Health and Hospitals Corporation's motion for summary judgment is granted in full, and Defendants Kings County Hospital and New York City Health and Hospitals Corporation are dismissed from this

---

[43] Because the Court finds that Plaintiff has not shown sufficient evidence of disability discrimination by Defendant NYCHH to enable her to survive summary judgment, it does not address Defendant NYCHH's argument that it was not Plaintiff's employer.

action.  The remaining parties shall file a joint pre-trial order within sixty (60) days of the date of

this Order.

SO ORDERED.

*/s/ Pamela K. Chen*

Pamela K. Chen
United States District Judge

Dated: September 21, 2020
          Brooklyn, New York